UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| KELLIE CANIDA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:08-CV-77 |
| v. | ) | |
| | ) | *Edgar / Lee* |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This action was instituted by the Plaintiff pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3)

seeking judicial review of the final decision of the Commissioner of Social Security

("Commissioner" or "Defendant") denying the Plaintiff a period of disability, disability insurance

benefits ("DIB"), and supplemental security income ("SSI") under Title II and Title XVI of the

Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1382. This matter was referred to the

undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil Procedure

for a report and recommendation regarding the disposition of Plaintiff's motion for judgment on the

pleadings [Doc. 12] and Defendant's motion for summary judgment [Doc. 18].

For the reasons stated herein, I **RECOMMEND** that: (1) Plaintiff's motion for judgment on

the pleadings [Doc. 12] be **DENIED** (2) Defendant's motion for summary judgment [Doc. 18] be

**GRANTED**; (3) the decision of Commissioner be **AFFIRMED**; and (4) this action be

**DISMISSED**.

## Administrative Proceedings

On June 30, 2004, Plaintiff filed applications for DIB and SSI, alleging disability since

February 8, 2002 (Tr. 86-91). After her applications were denied initially and upon reconsideration,

Plaintiff requested a hearing before an administrative law judge ("ALJ") (Tr. 47). At the first administrative hearing, which was held on July 11, 2006 (Tr. 761-86), Plaintiff amended the onset date of her disability to June 16, 2004. A supplemental administrative hearing was held on October 12, 2006 (Tr. 787-814). On November 3, 2006, the ALJ issued a decision denying Plaintiff's claims (Tr. 14-29). The decision of the ALJ became the final decision of the Commissioner on February 11, 2008, when the Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 7-9).

### Standard of Review

The Court must determine whether the ALJ failed to apply the correct legal standard and whether the ALJ's findings of fact were unsupported by substantial evidence. 42 U.S.C. § 405(g); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997)). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the Court might have decided facts differently, or if substantial evidence also would have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not re-weigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the

courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535,

548 (6th Cir. 1986)); *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir.

1986). The Court may consider any evidence in the record, regardless of whether it has been cited

by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The Court of

Appeals for the Sixth Circuit ("Sixth Circuit") has held that substantial evidence is "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner*, 745 F.2d

at 388 (citation omitted).

### How Disability Benefits Are Determined

The Sixth Circuit recently reiterated the five-step procedure used by the Social Security

Administration ("SSA") to determine eligibility for disability benefits as follows:

> The [Social Security] Act entitles to benefits payments certain
> claimants who, by virtue of a medically determinable physical or
> mental impairment of at least a year's expected duration, cannot
> engage in "substantial gainful activity." 42 U.S.C. § 423(d)(1)(A).
> Such claimants qualify as "disabled." *Id.* A claimant qualifies as
> disabled if she cannot, in light of her age, education, and work
> experience, "engage in any other kind of substantial gainful work
> which exists in the national economy." *Id.* § 423(d)(2)(A). To
> identify claimants who satisfy this definition of disability, the SSA
> uses a five-step "sequential evaluation process." 20 C.F.R §
> 404.1520(a)(4). The five steps are as follows:
>
> In step one, the SSA identifies claimants who "are doing substantial
> gainful activity" and concludes that these claimants are not disabled.
> *Id.* § 404.1520(a)(4)(i). If claimants get past this step, the SSA at step
> two considers the "medical severity" of claimants' impairments,
> particularly whether such impairments have lasted or will last for at
> least twelve months. *Id.* § 404.1520(a)(4)(ii). Claimants with
> impairments of insufficient duration are not disabled. *See id.* Those
> with impairments that have lasted or will last at least twelve months
> proceed to step three.
>
> At step three, the SSA examines the severity of claimants'
> impairments but with a view not solely to their duration but also to

the degree of affliction imposed. *Id.* § 404.1520(a)(4)(iii). Claimants are conclusively presumed to be disabled if they suffer from an infirmity that appears on the SSA's special list of impairments, or that is at least equal in severity to those listed. *Id.* § 404.1520(a)(4)(iii), (d). The list identifies and defines impairments that are of sufficient severity as to prevent any gainful activity. *See Sullivan v. Zebley,* 493 U.S. 521, 532, 110 S. Ct. 885, 107 L. Ed.2d 967 (1990). A person with such an impairment or an equivalent, consequently, necessarily satisfies the statutory definition of disability. For such claimants, the process ends at step three. Claimants with lesser impairments proceed to step four.

In the fourth step, the SSA evaluates claimants' "residual functional capacity," defined as "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). Claimants whose residual functional capacity permits them to perform their "past relevant work" are not disabled. *Id.* § 404.1520(a)(4)(iv), (f). "Past relevant work" is defined as work claimants have done within the past fifteen years that is "substantial gainful activity" and that lasted long enough for the claimant to learn to do it. *Id.* § 404.1560(b)(1). Claimants who can still do their past relevant work are not disabled. Those who cannot do their past relevant work proceed to the fifth step, in which the SSA determines whether claimants, in light of their residual functional capacity, age, education, and work experience, can perform "substantial gainful activity" other than their past relevant work. *See id.* § 404.1520(a)(4)(v), (g)(1). Claimants who can perform such work are not disabled. *See id.;* § 404.1560(c)(1). The SSA bears the burden of proof at step five. *See Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 474 (6th Cir.2003).

*Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).

### ALJ's Findings

The ALJ made the following findings in support of Commissioner's decision, which are conclusive if they are supported by substantial evidence in the record:

1.  The claimant meets the insured status requirements of the Social Security Act through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since June 16, 2004, the alleged onset date . . . .

4

3.       The claimant has the following severe impairments: colonic dysnergia, chronic obstructive pulmonary disease, emphysema, thoracolumbar scoliosis, degenerative disc disease, major depressive disorder, and anxiety . . . .

4.       The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 . . . .

5.       After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work activity which involves frequent postural movements; avoids exposure to extreme cold/heat, wetness, humidity, fumes, dust, odors, gases, and poor ventilation; requires simple but not detailed or complex tasks; does not require interaction with the general public; and is "low stress" requiring only occasional decision making, occasional changes in a work setting, and occasional exercising of judgment.

6.       The claimant is unable to perform any past relevant work . . . .

7.       The claimant was born on August 24, 1969 and is 37 years old, which is defined as a younger individual age 18-44.

8.       The claimant has at least a high school education and is able to communicate in English . . . .

9.       Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled", whether or not the claimant has transferable job skills . . . .

10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform . . . .

11.      The claimant has not been under a "disability," as defined in the Social Security Act, from June 16, 2004 through the date of this decision . . . .

(Tr. 19, 24-25, 27-29).

## Issues

The issues presented by Plaintiff are: (1) whether the ALJ erred in failing to accord proper weight to the opinions of Plaintiff's primary care physician, treating pulmonologist, and examining psychologist; and (2) whether substantial evidence supports the ALJ's finding as to the severity of Plaintiff's mental impairments [Doc. 13].

## Review of Evidence

### Plaintiff's Age, Education, and Past Work Experience

Plaintiff, a high school graduate, was 34 years-of-age at the time of her alleged onset of disability (Tr. 86). Plaintiff had past relevant work as an administrative clerk and a waitress (Tr. 162-67).[1]

### Medical Evidence

Only the most pertinent information will be briefly mentioned herein as it is not necessary to summarize all of the medical evidence, most of which is not in dispute. Whether or not the medical evidence is summarized herein, however, all of the relevant medical evidence has been reviewed and considered in reaching the recommendation set forth in this report and recommendation.

William R. Boyd, Jr., Ph. D., a licensed clinical psychologist, performed a consultative mental status evaluation of Plaintiff for the state agency on October 17, 2002 (Tr. 229-33). Dr. Boyd indicated Plaintiff appeared only mildly depressed at the time of his evaluation, although she was taking antidepressant medication (Tr. 229). Plaintiff was taking care of all of her personal hygiene

---

[1] Attached to Plaintiff's motion for judgment on the pleadings [Doc. 13] is a death certificate, indicating Plaintiff unfortunately died on April 5, 2008, due to hypoxia and aspiration of fluid in her lungs as a result of pneumonia and chronic obstructive pulmonary disease.

6

tasks and was working full time at Harrison Bay State Park (Tr. 231). She cooked, performed various housekeeping task and helped her six-year-old son with his homework (*id.*). Dr. Boyd's diagnosis was: adjustment disorder with depressed mood; nicotine dependence; nerve damage on left side, secondary to motor vehicle accident on February 8, 2002; psychosocial stressors – financial concerns and serious physical problems; current global assessment of functioning ("GAF") of 80 – no more than slight impairment in the primary areas; GAF for the past year of 80 – no more than slight impairment in the primary areas (Tr. 232). Dr. Boyd indicated that in terms of any impairment based upon strictly psychological/emotional factors, Plaintiff was functioning adequately in the areas of activities of daily living and social participation and that she had reported being able to sustain her cognitive focus and concentration adequately as she goes through the completion of her typical routine (Tr. 233).

James S. Walker, Ph. D. completed a psychiatric review technique form ("PRTF") for the state agency on November 13, 2002 (Tr. 238-250). Dr. Walker's PRTF addressed the requirements of listing 12.04, which deals with affective disorders (Tr. 238). Dr. Walker indicated Plaintiff suffered from an adjustment disorder with depressed mood (Tr. 241). With regard to the "B" criteria of listing 12.04, Dr. Walker indicated that Plaintiff had a mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of extended duration (Tr. 248). Dr. Walker also indicated there was no evidence that the "C" criteria of the listing was satisfied (Tr. 249).

Treatment records from Ken Kozawa, M.D. appear in the record (Tr. 265-66, 270-73, 275-281, 718-19). In a treatment note dated August 26, 2004, Dr. Kozawa indicated Plaintiff was suffering from colonic dysnergia and that, as all oral medications for the condition had been

unsuccessful, she would require surgical intervention (Tr. 265). Dr. Kozawa completed a medical

opinion form, at the request of Plaintiff's attorney, on December 14, 2004 (Tr. 712-15). Dr. Kozawa

indicated Plaintiff could sit for two hours out of an eight-hour workday and stand or walk for one

hour out of an eight-hour workday (Tr. 712). He indicated Plaintiff could frequently lift one to five

pounds and one to ten pounds, but should never lift or carry a greater weight (Tr. 712). Dr. Kozawa

also indicated Plaintiff could infrequently bend at the waist, reach above her shoulders, stand on a

hard surface and use her hands for fine manipulation (*id.*). Dr. Kozawa further indicated Plaintiff

would require bedrest during a normal workday and would require one hour of rest for every two

hours of work (Tr. 713). He indicated Plaintiff's pain could reasonably be considered severe and

that she could not reasonably be expected to be reliable in attending an eight-hour day, 40 hour

workweek in light of the pain or other limitations she experienced (*id.*). Dr. Kozawa indicated it was

reasonable that Plaintiff's pain, medical condition, or medication would cause lapses of

concentration or memory daily for several hours per day (*id.*). Finally, Dr. Kozawa indicated

Plaintiff would have a reasonable medical need to be absent from full time work on a chronic basis,

chronic meaning more than four times per month (Tr. 714).

Treatment notes from Kristy Dunn, M.S.N., under the supervision of Troy Gilson, M.D. at

Volunteer Behavioral Heath Services appear in the record (Tr. 488-514, 620-25). An assessment

of Plaintiff's mental residual functional capacity ("RFC"), on a State of Tennessee assessment form,

completed by Kristy Dunn on September 19, 2005, also appears in the record (Tr. 515-17). Ms.

Dunn indicated Plaintiff's activities of daily living were moderately impaired; her interpersonal

functioning was moderately impaired; her concentration, task persistence and pace was moderately

impaired – due to decreased concentration; and her adaptation to change was moderately impaired

– based upon increased symptoms with stress, change (Tr. 515-16). Ms. Dunn further indicated that during the previous year the Plaintiff's periods of severe dysfunction accumulated to a total of six months duration or longer (Tr. 516). Ms. Dunn indicated Plaintiff fell within a group of persons with severe and persistent mental illness and that her GAF for the previous year ranged from 55 to 58 (Tr. 517).

Treatment notes from Suresh Enjeti, M.D. appear in the record (Tr. 329, 341-42, 595-600, 627-28). A medical opinion form completed by Dr. Enjeti in December 2004, at the request of Plaintiff's attorney, appears in the record (Tr. 337-339). Dr. Enjeti indicated Plaintiff could infrequently lift and/or carry one to five pounds and one to ten pounds, but should never lift and/or carry weights greater than ten pounds (Tr. 337). He also indicated plaintiff could infrequently bend at the waist, reach above her shoulders, stand on a hard surface or use her hands for fine manipulation (*id.*). He indicated Plaintiff would require up to two hours of bedrest in a normal workday and, due to problems with stamina and endurance, she would require one hour of rest for every two hours of work (Tr. 338). Dr. Enjeti further indicated Plaintiff's pain was reasonably described as extreme and that, in light of her pain and other limitations, she could not reasonably be expected to be reliable in attending an eight-hour day, 40 hours per workweek (*id.*). Dr. Enjeti indicated Plaintiff's pain, medication, or medical condition would reasonably cause lapses in concentration or memory on a daily basis, for up to several hours per day (*id.*). Dr. Enjeti also indicated Plaintiff would have a reasonable medical need to be absent from work on a chronic basis and her subjective complaints were reasonable in view of his observations and diagnosis of chronic eosinophilic pneumonia (Tr. 339).

An assessment of Plaintiff's physical RFC was completed by Reeta Misra, M.D. for the state

agency on December 7, 2004 (Tr. 345-50). Dr. Misra indicated Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk, with normal breaks for a total of about six hours in an eight-hour workday and sit, with normal breaks, for about six hours in an eight-hour workday (Tr. 346). She indicated Plaintiff could frequently climb, balance, stoop, kneel, crouch, and crawl (Tr. 347).

C. Warren Thompson, Ph. D. completed a mental RFC assessment of the Plaintiff for the state agency on January 7, 2005 (Tr. 351-53). Dr. Thompson indicated Plaintiff's ability to interact appropriately with the general public was markedly limited (*id.*). Her abilities to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance and be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to accept instructions, to respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes were moderately limited (*id.*). Dr. Thompson rated all other aspects of Plaintiff's mental RFC as not significantly limited (*id.*).

Dr. Thompson also completed a PRTF for the state agency on January 7, 2005 (Tr. 355-68) addressing listings 12.04 – affective disorders, 12.06 – anxiety-related disorders, and listing 12.08 – personality disorders (Tr. 355). With regard to the "A" criteria of listing 12.04 – Dr. Thompson indicated Plaintiff suffered from a medically determinable impairment that did not precisely satisfy such criteria– major depressive disorder with psychotic traits (Tr. 358). Concerning the "A" criteria of listing 12.06, Dr. Thompson also indicated that Plaintiff suffered from a medically determinable impairment that did not precisely satisfy such criteria – general anxiety disorder (Tr. 360). With

regard to the "A" criteria of listing 12.08, Dr. Thompson likewise indicated Plaintiff suffered from a medically determinable impairment that did not precisely satisfy such criteria – dependent traits (Tr. 362). With regard to the "B" criteria of the aforementioned listings, Dr. Thompson indicated Plaintiff did not meet such criteria as she had a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence and pace; and had experienced no episodes of decompensation of extended duration (Tr. 365). With regard to listings 12.04 and 12.06, Dr. Thomson further indicated there was no evidence the "C" criteria of the listings was satisfied (Tr. 366).

David Caye, M.S. completed a consultative psychological evaluation of Plaintiff on December 1, 2004 for the state agency (Tr. 369-75). Plaintiff did not bring her medications with her to the evaluation, but she brought a list of 32 medications she was taking (*id.*). She told Mr. Caye she was depressed and did not get out of bed most days (*id.*). She did not want to see anybody and became agitated if anyone came to her house to see her or if she received a phone call (Tr. 369-70). She lost interest in personal hygiene and told Mr. Caye that if it were not for her son, she would not do anything (Tr. 370). She also stated her mind and concentration wandered (*id.*). Plaintiff drove herself to the evaluation and was carrying an oxygen tank (Tr. 372). She had a shuffling gait and was bent at the waist in a subservient pose (*id.*). She made multiple "I'm sorry" comments (*id.*). The expression on her face was distressed most of the time (*id.*). Mr. Caye's impressions were: major depressive disorder, recurrent, severe, with psychotic features; generalized anxiety disorder; dependent traits; global assessment of functioning ("GAF") of 50 to 55 (Tr. 373). Regarding Plaintiff's mental ability to function in a work setting, Mr. Caye stated her ability to understand was intact; her recall was mildly restricted; her concentration was markedly restricted; her persistence

Case 1:08-cv-00077-RAE-SKL   Document 20   Filed 07/08/09   Page 11 of 32   PageID #: 93

with task was moderately to severely restricted; her social interaction patterns were significantly restricted; her problem solving skills were moderately restricted and her adaptation was intact (Tr. 374).

Edward Johnson, M.D. performed a consultative physical examination of the Plaintiff for the state agency on October 26, 2004 (Tr. 376-82). Plaintiff brought a portable oxygen tank to the examination and was described by Dr. Johnson as "apprehensive throughout the examination and extremely concerned about the extreme severity of her medical condition." (Tr. 376). Dr. Johnson's impression was: (1) mild narrowing of the posterior aspect of L5-S1 disc space; (2) the right iliac crest is higher than the left with a mild thoracolumbar scoliosis; and (3) no other pathology noted (Tr. 380). Dr. Johnson stated the Plaintiff's extreme subjective complaints did not correlate with the objective findings, but that based upon his findings, Plaintiff would have difficulty performing any overhead lifting, reaching, pushing or pulling; may have difficulty performing any type of exertional activity or working around areas of extreme temperature changes or high respiratory allergens; would be able to occasionally lift and carry ten to 15 pounds; and should be able to sit, stand or walk for up to six hours with appropriate breaks (Tr. 381). Dr. Johnson also indicated that a psychological evaluation would be beneficial in a disability determination concerning Plaintiff (*id.*).

***Hearing Testimony***

It is not necessary to summarize all of the hearing testimony, however, all of the testimony has been reviewed and considered in reaching the recommendation set forth in this report and recommendation.

### A.    First Hearing

#### 1.    Plaintiff

Plaintiff testified at the first hearing as follows: She amended the onset date of her disability to June 16, 2004, the day she stopped working (Tr. 766).  She quit working because Dr. Kozawa told her not to work because she needed to have her colon removed (*id.*).

Plaintiff had tuberculosis at age 3, which resulted in scarring of her lungs (Tr. 768).  She began smoking cigarettes at age 18 and quit smoking several months prior to the hearing (Tr. 768-69).  Plaintiff had been told she had borderline emphysema and was using prescription oxygen at the hearing (Tr. 770-71).  She becomes short of breath when she engages in activities, such as vacuuming (Tr. 771), but also experiences shortness of breath while sitting or lying down (*id.*).

Plaintiff has had problems with anxiety, particularly because she knows her lungs are "messed up."  (Tr. 771-72).  Plaintiff does not leave the house unless she needs to see a doctor (Tr. 772).  Plaintiff has a problem with her neck, due to a motor vehicle accident, which limits her ability to put weight on her left side (*id.*).  She drops things if she tries to hold them with her left hand (*id.*).  Plaintiff has two children and her son lives with her (Tr. 774).  She takes care of her son, but has a lot of depression and anxiety (*id.*).  Plaintiff does not like to be around people and she cannot stand noise (*id.*).

Plaintiff's arm was also in a sling at the hearing (Tr. 782).  She stated she had been told to use the sling by her doctor because of nerve pain/nerve damage in her arm (Tr. 782-83).

Due to her medical conditions, Plaintiff experiences pain on a daily basis (Tr. 779).  She has had to stay in bed and rest on the couch due to her pain (*id.*).  She takes pain medication, which helps with the pain but does not eliminate it (Tr. 780).  The pain medication reduces her ability to

drive and concentrate (*id.*). Plaintiff stated she drives only when she has to – such as taking her son

to school and picking him up (Tr. 783). She stated she was having trouble driving her car because

problems with her left leg affected her ability to use a clutch (*id.*).

### 2. Vocational Expert

Mark Boatner testified as the vocational expert describing the Plaintiff's past relevant work

(Tr. 781-82).

### B. The Supplemental Hearing

### 1. Medical Advisor Griffin

Edward Griffin, M.D., who is board certified in internal medicine (Tr. 790), testified as a

Medical Advisor ("MA Griffin") at the supplemental hearing as follows: He reviewed the exhibits

in the administrative file (Tr. 790-91) and found Plaintiff's physical impairments, individually or

in combination, did not meet or equal any of the listed impairments (Tr. 791-92).[2] MA Griffin

testified some of the limitations to Plaintiff's RFC that were opined by Dr. Enjeti, such as limitations

to Plaintiff's ability to manipulate or to use her lower extremities, are not supported by his findings

as a pulmonologist (Tr. 793). MA Griffin also stated Dr. Kozawa's assessment that Plaintiff could

only sit for two hours out of an eight-hour day is not supported by his findings, specifically, not

supported by his diagnosis of colonic dsynergia – which means constipation (Tr. 794). MA Griffin

stated Plaintiff's chronic constipation was a side effect of her medications (Tr. 795). MA Griffin

stated Plaintiff's colonic dysnergia would not reduce the Plaintiff's RFC below the level identified

in his testimony (Tr. 795).

---

[2] The record reflects that approximately 10 minutes of MA Griffin's telephonic testimony were not recorded, when the tape of the hearing cut off and resumed 10 minutes later (Tr. 792). Plaintiff, however, has not challenged the completeness of the administrative record.

14

## 2. Medical Advisor Sack

Nancy Sack, Ph. D., a licensed clinical psychologist, who was also a medical advisor ("MA Sack") at the supplemental hearing (Tr. 797), testified as follows: MA Sack reviewed the administrative record prior to her testimony and testified Plaintiff's mental impairments, considered individually or in combination, met or equaled the listings (Tr. 798-99). MA Sack stated specifically that listing 12.06, the listing for anxiety disorders, is met or equaled based upon Plaintiff's motor tension, autonomic hyperactivity and apprehensive expectations (*id.*). MA Sack stated she based her conclusion upon the administrative record, particularly the medical records, which consistently talked about Plaintiff's anxiety and how much stress and fear she was experiencing related to her medical condition (*id.*). MA Sack stated Plaintiff's anxiety was related to her medical conditions; and, if Plaintiff's medical conditions were resolved, then her anxiety would resolve (Tr. 799-800). MA Sack stated there was no other listing besides 12.06 where the criteria were met or equaled. (Tr. 800).

With regard to the "B" criteria of listing 12.06, MA Sack stated Plaintiff's social functioning was markedly limited and difficulties in maintaining concentration, persistence and pace would be markedly limited (Tr. 801). MA Sack stated the state agency consultant found that Plaintiff's difficulties in maintaining concentration, persistence and pace would be moderately limited, but based upon the medical records, that described Plaintiff as having severe anxiety, MA Sack stated such a level of anxiety would result in Plaintiff having a marked level of difficulty with concentration, persistence and pace (Tr. 801-02). MA Sack stated Plaintiff had at least a mild to moderate limitation in activities of daily living (Tr. 802-03) and no episodes of decompensation (Tr. 803). MA Sack assessed that Plaintiff had a marked limitation in her ability to understand and

15

remember detailed instructions; a marked limitation in her ability to carry out detailed instructions; a marked limitation in her ability to maintain concentration, persistence and pace; a moderate to marked limitation in her ability to maintain attendance and be punctual; and a marked limitation in her ability to complete a normal workday and workweek without interruptions (Tr. 805).

### 3. Vocational Expert

Jane Colvin Roberson, who testified as a vocational expert at the supplemental hearing (Tr. 806), testified as follows: She described Plaintiff's past relevant work (Tr. 807-09). In response to a hypothetical involving a person of Plaintiff's age, education and experience; with the RFC for a full range of light work, posturals – crouching, crawling, climbing, balancing, stooping, kneeling – limited to the frequent level, a need to avoid exposure to extreme cold and extreme heat, wetness, humidity, fumes, odors, dusts, gases and poor ventilation; and with psychological restrictions which resulted in a limitation to simple work – no detailed or complex instructions; cannot deal with the general public, but can deal with supervisors and co-workers, and is also limited to a low stress job – a job that is limited to occasional decision making and exercise of judgment and only occasional changes in the work setting, the VE stated there would be jobs such a hypothetical individual could perform (Tr. 810). The VE stated that someone with the limitations to their physical and mental RFC set forth in the ALJ's hypothetical would be unable to perform the Plaintiff's past relevant work (Tr. 812).

## Analysis

### *Treating Physician Rule*

Plaintiff asserts the ALJ erred in finding she retained the RFC to perform a reduced range of light work, which precluded a finding of disability [Doc. 13]. Plaintiff argues that in making his

16

RFC determination, the ALJ did not accept the opinions or assessments set forth in the medical source statements completed by Dr. Kozawa, her treating general internist, or from Dr. Enjeti, a pulmonologist, who evaluated Plaintiff's lung impairments [*id.*]. Plaintiff asserts the ALJ erred in failing to accord substantial deference to the opinions of her treating physicians, Drs. Kozawa and Enjeti [*id.*]. Plaintiff also asserts the ALJ erred in according more weight to, or essentially adopting the opinion of, MA Griffin, the medical expert who testified at the supplemental hearing via telephone, and opined Plaintiff was capable of performing a full range of light work that does not require concentrated exposure to extreme environmental irritants [*id.* at 11].

The ALJ explained his findings concerning the medical source opinions stating:

> It appears that the claimant's most significant physical impairment is her pulmonary condition . . . .
>
> The claimant was subsequently evaluated by Suresh Enjeti, M.D., a specialist in pulmonary diseases, in November 2004. Physical examination was normal except for trace edema in the legs, despite the claimant's diffuse allegations of shortness of breath, back pain, coughing, constipation, difficulty swallowing, and an intermittent fever. Chest x-ray showed improved findings with only minimal thickening of interstitial and bronchovascular markings. In December 2004, Dr. Enjeti opined that, due to pneumonia, the claimant could only lift 1-10 pounds infrequently and infrequently bend, reach above her shoulders, and use her hands for fine manipulation. He also stated that she requires two hours of bed rest during the workday and additional breaks and could not reasonably be expected to be reliable in attending an eight-hour workday on a sustained basis. He reported she experiences "extreme" pain and may be absent more than four times in a given work month.
>
> Dr. Kozawa also reported significant limitations. In June and August 2004, he stated that the claimant is unable to work and is "incapacitated." In December 2004, he reported specific limitations of sitting no more than two hours and standing/walking only one hour in a workday. He stated that the claimant can only lift 1-10 pounds infrequently and only occasional [sic] reach above her shoulders and use her hands for fine manipulation. Dr. Kozawa also pined [sic] that

17

the claimant requires bed rest and additional breaks and could not maintain attendance for eight hours a day, five days a week, and estimated she would be absent more than four times in a work month. . . .

Dr. Griffin, an impartial medical expert in internal medicine, testified at the supplemental hearing and averred he had reviewed the entire medical record. He stated that the claimant's physical impairments, either singly or in combination, do not meet or equal the criteria of any listing. He reported the claimant has a history of mild chronic obstructive pulmonary disease and mild emphysema on pulmonary function testing and arterial blood gases. Dr. Griffin also noted evidence of scoliosis and minimal degenerative disc disease without signs of radiculopathy and with "fairly unremarkable" results on MRIs, and added that the claimant was more limited by her pulmonary condition rather than a musculoskeletal impairment. He opined the claimant could lift 20 pounds occasionally, 10 pounds frequently, with no restrictions in standing, walking, sitting, bending, stooping, squatting, or using her arms and legs. He recommended avoidance of a concentrated exposure to extreme heat, humidity, cold work environments, and environmental irritants such as dust and fumes. Dr. Griffin acknowledged the claimant's history of colonic dysnergia, or constipation, which he reported was likely caused by her narcotic medications. However, he noted that her ability to perform the above work-related limitations was not reduced by this condition. According to Dr. Griffin, the limitations opined by Dr. Enjeti in December 2004 were shortly after the claimant's episode of pneumonia, which cleared, and Dr. Enjeti's limitations are not supported by subsequent testing. Dr. Griffin also reviewed the limitations opined by Dr. Kozawa but noted that his limitations were not supported by his diagnosis of constipation. Finally, Dr. Griffin testified there was evidence of drug seeking behavior and the claimant's complaints were out of proportion to the objective findings.
. . .

I give significant weight to Dr. Griffin's opinion that the claimant's physical impairments do not meet or equal any listing. The record fails to show abnormalities on pulmonary function testing to meet the requirements of any listing in section 3.00 of Appendix 1. Further, there is no evidence of motor or sensory loss to meet the musculoskeletal requirements or 1.04 of signs of anemia, ulceration, esophageal obstruction, colitis, enteritis, or significant weight loss to satisfy any gastrointestinal listing under section 5.00. Therefore, Dr. Griffin's opinion is supported by the medical evidence of record and I find the claimant's physical impairments, either singly or in

18

combination, do not meet or equal any criteria outlined in Appendix 1.

. . .

I afford significant weight to Dr. Griffin's opinion regarding the claimant's work-related limitations, which are consistent with light work activity that avoids exposure to extreme cold/heat, wetness, humidity, fumes, dust, odors, gases and poor ventilation. The record shows some mild to moderate abnormalities on physical examinations, MRI's, x-rays, and CT scans which can reasonably be expected to cause this level of limitation. In addition, Dr. Griffin reviewed the entire medical record, which was not available to other physicians of record. Although I note that the limitations assessed by the consulting physician allow for a limited range of light work, the consulting physician did not have the benefit of the entire medical record, as did Dr. Griffin. Therefore, greater weight is afforded Dr. Griffin's opinion.

I have also considered the limitations opined by Dr. Enjeti and Dr. Kozawa, both of whom offered their opinions during the claimant's recuperative period from pneumonia. The subsequent record shows that the claimant's pulmonary condition improved and objective testing since February 2005 essentially demonstrates only mild pulmonary abnormalities. In addition, the record fails to show a supportive clinical or objective basis for their opinions that the claimant's ability to use her hands for fine manipulation is limited or diminished in any capacity. Therefore, little weight is afforded their opinions. Dr. Kozawa's conclusory opinions of total disability from constipation are also afforded little weight. The record does not show evidence of weight loss, impaction, or surgery for this condition and conclusory opinions of disability cannot be afforded significant weight as determinations of disability under the Social Security Act are reserved to the Commissioner.

. . .

Pursuant to Social Security Ruling 96-6p, I have also considered the opinions of nonexamining state agency consultants who restricted the claimant to medium work activity that requires detailed instructions and does not involve interaction with the general public. However, state agency sources did not have the benefit of the most recent medical records or Dr. Griffin's credible testimony at the hearing. Accordingly, the opinions of state agency examiners are afforded less weight.

(Tr. 21, 23-24, 26-27) (internal citations omitted).

19

Applicable regulations state the Commissioner will evaluate every medical opinion and will consider the following factors in deciding what weight to give each opinion: examining relationship; treatment relationship; supportability; consistency; specialization; and other factors. 20 C.F.R. §§ 404.1527(d), 416.927(d). Although a treating physician's opinion typically is entitled to substantial deference, as argued by Plaintiff, the ALJ is not bound by that opinion. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). The Sixth Circuit has consistently stated the treating source's opinion is entitled to deference only if it is based on objective medical findings, *see, e.g.*, *Warner*, 375 F.3d at 390; *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993), *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985), and not contradicted by substantial evidence to the contrary. *Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 927 (6th Cir. 1987).

If the treating source's opinion is not given controlling weight, its weight is determined by the same factors that are considered in evaluating every medical opinion. It is well-settled law in the Sixth Circuit that if an ALJ does not accord controlling weight to the opinion of a claimant's treating source, the ALJ must apply certain factors in determining what weight to give the opinion. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004). Pursuant to the regulations, the ALJ:

> is to consider (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, and (5) the specialization of the treating source.

*Id.* (quoting 20 C.F.R. § 404.1527(d)).

The ALJ must weigh the opinions of the acceptable medical sources, including the opinions

of the treating physicians and the state agency medical sources, as required by applicable regulations, and resolve inconsistencies between the acceptable sources. *See* 20 C.F.R. §§ 404.1527(d)(4), (f)(2)(i) and 416.927(d)(4), (f)(2)(i). With respect to weighing the opinions, the Sixth Circuit has held the opinion of a treating physician generally is entitled to greater weight than the contrary opinion of a consulting physician who has examined the claimant on only a single occasion. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997); *Hardaway*, 823 F.2d at 927. An ALJ may, however, discount a treating physician's opinion based on an opinion of an examining or a reviewing physician in appropriate circumstances. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993); *Moon v. Sullivan*, 923 F.2d 1175, 1183 (6th Cir. 1990). The responsibility for weighing the record evidence, including conflicting physicians' opinions, and resolving the conflicts rests with the ALJ. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

In addition, the ALJ must give good reasons for the weight given a treating source's opinion. *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 461 (6th Cir. 2005); 20 C.F.R. § 404.1527(d)(2)). This reason-giving requirement is "clearly procedural ensuring 'that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.'" *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007) (quoting *Wilson*, 378 F.3d at 544). The reason-giving requirement in § 404.1527(d)(2) "exists, in part, for claimants to understand why the administrative bureaucracy deems them not disabled when physicians are telling them that they are." *Id.* In the Sixth Circuit:

> [b]ecause of the significance of the notice requirement in ensuring that each denied claimant receives fair process, a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the

> weight accorded the opinions, denotes a lack of substantial evidence,
> even where the conclusion of the ALJ may be justified based upon
> the record.

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007).

Contrary to Plaintiff's assertions, the ALJ followed the appropriate steps in deciding not to give controlling weight to the opinions of Drs. Kozawa and Enjeti and also set out adequate reasons, supported by the record, for his decision not to accord controlling weight to their opinions. Moreover, the ALJ articulated adequate reasons for according significant weight to the opinion of MA Griffin based upon his testimony at the hearing. The regulations provide the ALJ with the discretion to decide whether to call a medical expert. *Davis v. Chater*, No. 95-2235, 1996 WL 732298, *2 (6th Cir. Dec. 19, 2006). The affirmative testimony of a medical advisor can constitute substantial evidence in support of the ALJ's decision if the medical advisor's opinion is based on the medical evidence; namely, the medical reports from the plaintiff's treating sources. *Johnson v. Sec. of Health & Human Serv's*, No. 93-1467, 1994 WL 198193, *6 (6th Cir. May 19, 1994) (citing *Atterberry v. Sec. of Health & Human Serv's*, 871 F.2d 567, 590 (6th Cir. 1989)). *See also Buxton v. Halter*, 246 F.3d 762, 775 (6th Cir. 2001) (An ALJ can rely on the testimony of non-examining medical expert physicians to make sense of conflicting evidence in the record).

The ALJ considered the opinion of MA Griffin, who after reviewing the entire record, concluded Plaintiff could perform light work that avoids exposure to extreme cold/heat, wetness, humidity, fumes, dust, odors, gases and poor ventilation. MA Griffin testified the limitations set forth by Dr. Enjeti in his December 2004 questionnaire, which was completed shortly after Plaintiff had experienced an episode of pneumonia and recovered, were unsupported by the subsequent testing. MA Griffin also testified that some of the limitations set forth by Dr. Enjeti – including

limitations to Plaintiff's ability to bend at the waist, reach above her shoulders, stand on a hard surface or use her hands for fine manipulation – were unrelated to Dr. Enjeti's treatment of Plaintiff as a pulmonologist or the diagnosis of chronic eosinophilic pneumonia, which Dr. Enjeti cited as support for his opinion. MA Griffin also testified the limitations set forth by Dr. Kozawa in his December 14, 2004 questionnaire were not supported by his diagnosis of colonic dysnergia or chronic constipation, which Dr. Griffin stated was a side effect of the medications Plaintiff was taking and would not result in a limitation of Plaintiff's RFC below the level identified by MA Griffin in his testimony. The ALJ also noted Dr. Kozawa's and Dr. Enjeti's assessments involved the point in time when Plaintiff was recuperating from a bout of pneumonia. Further, the results of the consultative examination performed by Dr. Johnson on October 26, 2004, although arguably slightly more restrictive in terms of RFC than MA Griffin's assessment, are much more consistent with the testimony of MA Griffin than the far more restrictive limitations set forth by either Dr. Enjeti or Dr. Kozawa in their respective questionnaires.

Therefore, I **CONCLUDE** the ALJ did not err in not according controlling weight to the opinions of Plaintiff's treating physicians, Drs. Enjeti and Kozawa, and that his determination of Plaintiff's physical RFC is supported by substantial evidence in the record.

*Psychological (Mental) Impairments*

Plaintiff asserts the ALJ's finding as to the severity of her mental impairments is error, as substantial evidence in the record shows Plaintiff experiences marked limitations in her ability to perform activities of daily living, maintain social functioning, and maintain concentration, persistence or pace [Doc. 13 at 12]. Plaintiff asserts the treatment notes from Volunteer Behavioral Health Care – completed by Kristy Dunn under the supervision of psychiatrist Dr. Troy Gilson – and

23

the results of the consulting psychological examination completed by David Caye, indicate Plaintiff

experienced significant limitations in her ability to perform daily activities of living, maintain social

functioning, and sustain concentration, persistence or pace beyond the moderate difficulties found

by the ALJ [*id.* at 12-14]. Plaintiff further asserts MA Sack opined that Plaintiff exhibited marked

mental impairments that precluded Plaintiff from engaging in sustained full-time work activity [*id.*

at 14-15]. Plaintiff asserts that despite the observations/diagnoses of Ms. Dunn/Dr. Gilson, Mr.

Caye and MA Sack, the ALJ erred in adopting the opinion of the state agency reviewing physician,

Dr. C. Warren Thompson [*id.* at 15-16]. Plaintiff asserts the ALJ erred in not according substantial

weight to the opinion of Plaintiff's treating psychologist, Dr. Gilson, as it is consistent with and

supported by the findings and opinion of Mr. Caye and the opinion of MA Sack [*id.* at 16].

      The ALJ explained his findings concerning the opinions relating to Plaintiff's psychological

limitations stating:

> The record also shows complaints of depression and anxiety, for
> which medications have been prescribed. The claimant's primary
> care sources have noted tearfulness and anxiety. The claimant
> initiated mental health treatment in August 2004 for depression,
> irritability, nerves, and poor sleep. Mental status showed a normal
> appearance, speech, orientation, thought processes, and psychomotor
> activity. The claimant exhibited a sad affect, anxious behavior, and
> a depressed mood, but concentration, memory, insight, and impulse
> control were "good." She was diagnosed with an anxiety disorder
> and mood disorder and a Global Assessment of Functioning (GAF)
> of 55 was reported which, according to the Diagnostic and Statistical
> Manual for Mental Disorders - IV Edition, is indicative of moderate
> symptoms and functional restriction. By November 2004, the
> claimant's GAF had risen to 58, although she alleged increased
> symptoms since running out of her medications. Mental status,
> however, was normal. Her GAF remained 58 until February 2006.
> In fact, in May 2005, the claimant admitted her sleep had improved,
> she retained a good appetite, and she was attending her son's
> ballgames. Her medications were frequently adjusted due to her
> persistent complaints of symptoms and, in February 2006, the

claimant alleged having a severe fear of germs with frequent hand washing, intrusive thoughts, panic attacks, and tangential thoughts. Her GAF decreased to a 50, consistent with serious symptoms and limitations, but the claimant refused counseling. She subsequently denied any improvement, despite medications, although mental status by June 2006 was normal except for an anxious affect.

A consultative psychological evaluation was also performed at the request of the Social Security Administration in December 2004. The claimant alleged depression with a desire to stay in bed most days and do nothing. She also alleged erratic sleep, tearfulness, loss of interest in activities, increased appetite, vague auditory hallucinations, and difficulty focusing and finishing tasks, and she stated that she becomes agitated. Reported activities included watching television, grocery shopping with others, vacuuming, doing the laundry, cooking, washing dishes, getting her son up and ready for school, attending boy scout meetings, helping with her son's homework, and rarely driving. The claimant exhibited nervous behavior, erratic eye contact, agitation, a depressed mood, and a distressed expression. However, she gave relevant, coherent, and goal-directed answers to questions. There was minimal smiling and a mild inefficiency of cognitive skills. Diagnoses were a major depressive disorder and a generalized anxiety disorder. The examiner opined that the claimant has a mild limitation in her ability to recall, moderate restrictions in concentration and problem solving, and a significant impairment in social interaction. Her abilities to understand and adapt were reported as intact.
. . .
Dr. Sack, the impartial medical expert in psychology, opined that the claimant's anxiety disorder meets the requirements of Listing 12.06 with marked limitations in social functioning and sustaining concentration, persistence, and pace. She stated the claimant's impairment had been of this severity since August 2004. She also reported that the claimant's anxiety is primarily related to her medical condition and, if she medically improved, her anxiety would also improve. Dr. Sack stated that the claimant's depressive episodes were minor and the record did not show sufficient severity of symptoms to warrant a diagnosis of a personality disorder. She further testified that, while prescribed medications had been helpful, they had not reduced the claimant's symptoms sufficiently to improve her overall functioning.
. . .
Guidance in the evaluation of mental impairments and their impact on an individual's ability to perform work activity is provided in the

Regulations at 20 CFR 404.1520a and 416.920a. A special procedure describes diagnostic criteria for eight categories of listed mental impairments. Then, once the diagnostic criteria are satisfied for mental impairments, the "B" and/or "C" criteria are used to rate impairment severity. The claimant's mental impairments appear to meet the diagnostic, or "A" criteria of listings 12.04 and 12.06.

Under the "B," or functional criteria of these listings, I find the claimant's impairments impose a moderate difficulty completing daily activities and moderate to marked limitation in maintaining appropriate social interaction. Although she has alleged essentially doing nothing, the record actually demonstrates that she helps her son with his homework and getting him ready for school, prepares meals, watches television, goes grocery shopping, vacuums, does the laundry, washes dishes, and attends her son's events, *i.e.*, boy scouts and ball games. She has appeared somewhat anxious on occasion, but has still demonstrated generally appropriate interaction with others and she did so at both hearings. I further find that the claimant's mental impairments cause a moderate difficulty in her ability to maintain concentration, persistence, and pace for complex and detailed tasks. This will reasonably limit the claimant to the performance of unskilled work activity, which is consistent with the claimant's ability to assist her [son] with his homework. There is no indication of episodes of deterioration or decompensation in a work or worklike setting. The "C" criteria of listings 12.04 and 12.06 are not evident.

I have considered Dr. Sack's opinion that the severity of the claimant's anxiety meets Listing 12.06 with marked limitations in social functioning and concentration, persistence, and pace. However, Dr. Sack's opinion is not supported by the overall record. I note that assessed GAFs by the claimant's own treating mental health sources are indicative of only moderate functional restriction until February 2006 and then the record fails to show that GAFs of 50 are expected to continue for at least 12 months. Mental status findings have only shown significant abnormalities on a sporadic basis which also fail to support Dr. Sack's opinion. In addition, despite a GAF of 50, mental status findings during the most recent evaluation in June 2006 were essentially normal except for an anxious affect and slightly dramatic presentation. I also note that the claimant refused counseling which is not indicative of an individual experiencing the debilitating level of mental symptoms reported by Dr. Sack. Therefore, I find Dr. Sack's opinion to be unsupported by the overall record and afford it little weight.

26

. . .

> As with exertional capacity, SSR 96-8p requires a claimant's non-exertional capacity be expressed in terms of work-related functions. I accept that the claimant has non-exertional limitations, due to depression and anxiety, which restrict her to work that involves understanding, remembering, and carrying out only unskilled tasks and does not require interaction with the general public. I further find that, due to anxiety which could increase with stress, the claimant is limited to jobs that are essentially "low stress," i.e. work which involves only occasional decision making, occasional changes in a work setting, and occasional exercising of judgment. These limitations are supported by the opinion and findings of the consulting psychological examiner.

(Tr. 22-25, 27) (internal citations omitted).

"Psychological (mental) impairments are non-exertional impairments which must be included in the [Commissioner's] evaluation of a Plaintiff's limitations." *Walker v. Bowen*, 834 F.2d 635, 642 (7th Cir. 1987). "The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity." *Washington v. Shalala*, 37 F.3d 1437, 1440 (10th Cir. 1994) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A)). An alleged mental impairment must be established by medical evidence consisting of clinical signs, symptoms and/or laboratory findings or psychological test findings. 20 C.F.R. Part 404, Subpt. P. App. 1, § 12.00(b); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990). If the ALJ determines a claimant has medically determinable mental impairments, the ALJ must then rate the degree of functional limitations resulting from the mental impairments according to the standards set forth in § 404.1520a(c). 20 C.F.R. § 404.1520a(b)(2). Once the degree of functional limitation imposed by a claimant's mental impairments has been determined by the ALJ, the ALJ then determines the severity of the claimant's mental impairments. 20 C.F.R. § 404.1520a(d).

The ALJ's finding as to Plaintiff's mental RFC, *i.e.*, the severity of the limitations imposed

on her ability to engage in substantial gainful employment imposed by her mental limitations is also supported by substantial evidence in the record. As noted, the ALJ found Plaintiff's impairments imposed a moderate difficulty completing daily activities; a moderate to marked limitation in maintaining appropriate social interaction; and a moderate difficulty in her ability to maintain concentration, persistence and pace for complex and detailed tasks, which limited the Plaintiff to engaging in unskilled work activity (Tr. 25). Treatment notes from Volunteer Behavioral Health Care System and the evaluation form completed by Ms. Dunn indicated that Plaintiff was moderately impaired in her activities of daily living, her interpersonal functioning, her concentration, task persistence and pace, and her adaptation to change. The consultative examiner, Mr. Caye, also indicated although Plaintiff's ability to understand was intact, her recall and concentration were mildly restricted, her persistence with tasks was moderately to severely restricted, her social interaction was significantly restricted, and her problem solving skills were moderately restricted.

MA Sack, who reviewed the entire record and testified at the supplemental hearing, opined Plaintiff satisfied the "B" criteria of listing 12.06 because her social functioning and difficulties in maintaining concentration, persistence and pace were markedly limited and Plaintiff had a mild to moderate limitation in her activities of daily living. MA Sack explicitly testified that although the state agency reviewing physician, Dr. Thompson, indicated in his PRTF that Plaintiff's difficulties in maintaining concentration, persistence and pace were moderately limited, the medical records, which described Plaintiff's anxiety as being severe, would result in the limitation to Plaintiff's concentration, persistence and pace being a marked limitation due to the severity of her level of anxiety.

The ALJ found, however, that MA Sack's opinion was entitled to little, if any, weight as it was not consistent with the overall evidence of record concerning the severity of Plaintiff's mental impairment. The ALJ also stated: (1) the GAF scores assigned by Ms. Dunn/Dr. Gilson and Mr. Caye – GAF scores in the 50's – were indicative of only moderate functional restriction and (2) the Plaintiff's refusal of counseling was not indicative of an individual experiencing the debilitating level of mental symptoms opined by MA Sack. The Sixth Circuit has reviewed the impact of GAF scores, noting the Commissioner had declined to endorse the GAF score for use in SSA programs and that GAF scores have no "direct correlation" to the severity requirements of mental disorders listings." *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006) (quoting *Wind v. Barnhart*, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (quoting 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)). Nevertheless, the ALJ properly considered the fact that the GAF scores assigned to Plaintiff by Ms. Dunn/Dr. Gilson and Mr. Caye were consistent with, and therefore supported, their assessments of the severity of the limitations imposed by Plaintiff's mental impairments and inconsistent with the disabling severity of MA Sack's opinion.

The ALJ stated MA Sack's opinion was entitled to little weight in part because Plaintiff refused counseling, which the ALJ characterized as not being indicative of an individual experiencing the debilitating level of mental symptoms opined by MA Sack. Contrary to this statement, the record reflects Plaintiff sought treatment at Volunteer Behavioral Health Care Systems. The treatment records cited by the ALJ for his conclusion that Plaintiff refused counseling are the records from Volunteer Behavioral Health Care Systems and the relevant treatment note states Plaintiff reported she was:

> "doing awful." Reports increase in anxiety, panic attacks. Isolating self. Cancelled medical appts "just don't want to leave the house" .

> . . . strongly encouraged to follow up and keep all appts . . . Affect
> is anxious, slightly dramatic. . . . she reported "I think I'm about to
> have a panic attack.

(Tr. 620). While the treatment note cited by the ALJ reflects Plaintiff was cancelling medical appointments, but it does not reflect she failed to keep her appointment at Volunteer Behavioral Health Care Systems. Moreover, the treatment note reflects Plaintiff was cancelling appointments and isolating herself because of her psychological condition – panic attacks and increased anxiety. Even assuming for the sake of argument that Plaintiff refused further mental health counseling, the Sixth Circuit has held it is a questionable practice for an ALJ to criticize a plaintiff for the failure to seek psychiatric treatment for a mental condition if the mental impairment may be the reason for the failure to do so. *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989) (per curiam).

However, the ALJ found Plaintiff's subjective complaints, including her complaints as to the severity, *i.e.*, the limiting effects, of her mental impairments, were not fully credible (Tr. 25, 26). This finding was clearly integral to the ALJ's finding as to the severity of Plaintiff's mental impairments as well as to the finding of the severity of the limitations imposed by Plaintiff's physical impairments. Plaintiff has not challenged the ALJ's credibility finding and, thus, has waived review of this issue. *Yamin v. Comm'r of Soc. Sec.*, 67 F. App'x 883, 884 (6th Cir. 2003)).

Thus, although one of the grounds set forth by the ALJ for discounting MA Sack's more extreme opinion as to the severity of Plaintiff's mental opinion– the refusal of mental health counseling – is error, such error is harmless as I find the ALJ would have reached the same ultimate conclusion if the erroneous finding were removed. *See Berryhill v. Shalala*, No. 92-5876, 1993 WL 361729, *7 (6th Cir. 1993). In *Berryhill*, the Sixth Circuit held the decision of the Commissioner

can be affirmed based on a harmless error analysis in those situations where a district court concludes the Commissioner would have reached the same ultimate conclusion if the erroneous finding were removed from the picture.

In reaching his conclusions, the ALJ weighed the opinion evidence, including Dr. Thompson's opinion, and Plaintiff's reported activities. As noted, the ALJ erred in finding Plaintiff refused treatment for her mental condition and discounting MA Sack's opinion on that basis. However, the ALJ correctly found that MA Sack's more extreme opinion as to the severity of Plaintiff's mental limitations was not consistent with the record as it was far more severe than the limitations set forth in the assessments of Ms. Dunn/Dr. Gilson and Mr. Caye, including the GAF scores which they assigned to Plaintiff. Moreover, MA Sack testified that she based her more restrictive opinion about the severity of Plaintiff's mental limitations on the treatment records – in which Plaintiff essentially made statements and/or self-reports about the level of anxiety or fear she was experiencing related to her medical condition (Tr. 799). Because the ALJ found Plaintiff's subjective complaints were not fully credible, the ALJ had a reasonable basis for discounting MA Sack's more extreme opinion as to the limitations imposed by Plaintiff's mental impairments as MA Sack's opinion assumed Plaintiff's subjective complaints concerning the level of her fear and anxiety were fully credible. Thus, the ALJ's error in concluding Plaintiff refused counseling for her mental condition was harmless because the ALJ clearly had grounds for reaching his decision as to the severity of the limitations imposed by Plaintiff's mental impairments absent this error.

Accordingly, I **CONCLUDE** the ALJ's finding as to the severity of Plaintiff's mental impairments is supported by substantial evidence in the record and he gave good reasons for his conclusions regarding Plainitff's mental RFC. While there is also substantial evidence in the record

to reach a difference conclusion, the ALJ's determination that Plaintiff is not disabled as defined by the Social Security Act must be affirmed as it falls within the "zone of choice" accorded to the Commissioner in making disability determinations. *Felisky*, 35 F.3d at 1035.

## Conclusion

Having carefully reviewed the administrative record and the briefs of the parties filed in support of their respective motions, for the reasons stated above I **RECOMMEND**:[3]

(1)     Plaintiff's motion for judgment on the pleadings [Doc. 12] be **DENIED**;

(2)     Defendant's motion for summary judgment [Doc. 18] be **GRANTED**;

(3)     Judgment be entered pursuant to Rule 58 of the Federal Rules of Civil Procedure **AFFIRMING** Commissioner's decision; and

(4)     This action be **DISMISSED**.

s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[3] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).